Billings, Thomas R, J.
All defendants have moved to dismiss all counts against them in these two consolidated actions, as failing to state a claim. For the following reasons, all defendants’ Motions to Dismiss are ALLOWED as to claims asserted under G.L.c. 93A, and are otherwise DENIED.
ALLEGATIONS OF THE COMPLAINTS
The following are summaries of the allegations in the two complaints, whish are for present purposes assumed to be true.
A. The Petersen Complaint
The Petersen plaintiffs are twenty-six individuals resident in several American states (including one in Massachusetts), the District of Columbia, and Norway. Defendants US Airways and Hawaiian Airlines are foreign corporations, each of which at all material times “was engaged in the business [of] operating an online shopping mall.” Defendant EasyCGI[1] “was engaged in the business of operating as a merchant selling computer related storage services,” while defendant FreeCause “was engaged in the business of hosting and powering online shopping malls.”[2] Each defendant is alleged, without elaboration, to be the agent, alter-ego, employee, servant, joint venturer and/or co-conspirator of the others. A contractual venue clause specifies Suffolk County, Massachusetts, where EasyCGI and FreeCause are both headquartered and where the other defendants conduct and solicit business.
Each of the “online shopping malls”—the US Airways Dividend Miles Shopping Mall and the Hawaiian Airline eMarket Shopping Mall—offered merchandise sold by EasyCGI, among other merchants, and periodically offer frequent flyer program miles as an incentive for each purchase. In June 2011 purchasers from the US Airways mall were offered 4,757 miles for each purchase, plus 75% more if the purchaser enjoyed “platinum” status in US Airways’ frequent flyer program. At the same time, the Hawaiian mall was offering 7,269 miles per purchase.
At the time, the US Airways displayed ‘Terms of Service” which included a statement that US Air dividend miles
*667 will be awarded for your qualifying purchases from participating Merchants in the Mall... All qualifying purchases will earn Miles per the mileage offer displayed for each participating Merchant. It is your responsibility to read carefully the exclusions for any Merchant and to ensure that your purchases qualify for Mileage awards.
The plaintiffs are informed and believe that similar language appeared on the Hawaiian mileage mall site. They read all exclusions and other terms, and found the following: “RESTRICTIONS: There are no restrictions at this time.” The mileage mall websites also had a Frequently Asked Questions section which added:
Q. Is there a limit to the amount of miles I can earn?
A. NO, you can earn as many miles as you like. There is no cap.
For about a week in June 2011, the plaintiffs began making “numerous purchases” on both malls—two on Hawaiian, 23 on US Airways, and one on both. Within a week after the purchases were made, however, the defendants wrongfully and without good cause rejected all of the plaintiffs’ purchases and the mileage awards corresponding to them. (This was in apparent reaction to the fact that the Petersen plaintiffs, according to their Chapter 93A demand letter, made purchases qualifying them for approximately 200 million miles in total.)
There are claims for breach of contract (Count 1 against EasyCGI and Count 2 against FreeCause and the airlines) and under Chapter 93A of the General Laws (Count 3 against all defendants). Damages and/or specific performance are sought.
B. The Jorgensen Complaint
Mr. Jorgensen, who represents himself, filed an Amended Complaint following the Court’s allowance of a motion for more definite statement. The defendants are FreeCause, US Airways, and EasyCGI; the claims, for breach of contract, “loss of the bargain,” and violation of Chapter 93A. The Amended Complaint alleges that in June 2011, the plaintiff entered into a binding contract with FreeCause, acting in its capacity as authorized agent for US Airways, for products and services provided by EasyCGI. “The Applicable Contract US AIRWAYS Dividend Terms of Service) explicitly states as follows:
The US Airways Dividend Miles Shopping Mall “Mall” is a website that is hosted and powered by Free Cause, Inc. on behalf of US Airways, Inc. Any reference to “We,” “Our,” “Us” or the like in these Terms of Service refers collectively to US Airways and Free Cause, Inc. “You,” “Your” or the like refers to you, the user of this Mall."
There were also these statements:
“Restrictions on Offer—There are no restrictions at this time.”
And:
“You can earn as many miles as you like. There is no cap.”
The plaintiff accessed the “mall” via US Airways’ site, “USAIRWAYS.com—Shopping Mall.” He made personal, non-automated purchases with consideration in the form of charges to a credit card(s) he owned and which were in good standing. The charges were posted on his credit card statements, and “(a]ll purchases were instantly confirmed as to validity in writing by [EasyCGI],” which “activated a customer account in the name of Plaintiff, Steen Jorgensen and commenced providing the services contracted for.” “A small number of mileage credit postings initially appeared correctly on Steen Jorgensen’s US AIRWAYS Dividend Miles Account at the contracted rate of 4,757 miles per transaction.”
Thereafter, however, the defendant breached the contract by willfully and wrongfully denying delivery of the promised miles and by reversing those miles which had been credited to the plaintiffs US AIRWAYS Dividend Miles Account. They violated Chapter 93A “by willfully and maliciously denying due mileage credit,” and reversing those miles that had already been credited to the plaintiffs account. The plaintiff would have used some or most of the miles to travel out of Boston, where his daughter and frequent traveling companion lives. He served a Chapter 93A demand letter on all defendants. All have acknowledged receipt, but none has made a reasonable offer of settlement. The plaintiff seeks as damages the replacement cost of the dividend miles contracted for but not delivered.
DISCUSSION
The defendants have asserted the following grounds for dismissal of the Petersen complaint. Addressing Count 3 (Chapter 93A) first, US Airways argues that its actions lacked the extortionate quality needed to transform a “mere breach of contract” into a Chapter 93A violation; that its conduct took place outside of Massachusetts such that Chapter 93A does not apply;[3] and that although the plaintiffs sent a pre-suit demand letter, this is not specifically alleged in the Complaint and the letter they in fact sent was insufficient. On Count 2 (breach of contract), US Airways argues that it did not have a contract with the plaintiffs and that nothing it did is alleged to have been the proximate cause of harm to the plaintiffs. Finally, US Airways seeks to strike the prayers for single damages, multiple damages, and attorneys fees because its “Dividend Miles Membership Guide” provides, “Dividend Miles have no cash value,” and (concerning multiple damages) because it made a reasonable settlement offer of 50,000 miles to each plaintiff.
US Airways’ motion to dismiss in the Jorgensen case substantially replicates the arguments it makes in Petersen, adding that “since his contract was clearly with EasyCGI,” the plaintiffs allegation that FreeC- *668 ause acted as US Airways’ agent is irrelevant and also insufficiently pled.
Hawaiian Airlines, FreeCause, and EasyCGI are jointly represented, and have filed a single joint motion to dismiss in each case. They argue that even if there was a contract between the plaintiffs and EasyCGI (Petersen Complaint Count 1), the latter’s liability was expressly limited to dollar amounts paid to EasyCGI, and that in fact nothing was paid because the transactions were reversed. The contract claim against FreeCause (Count 2) “fails,” they add, because the transactions were reversed such that “plaintiffs made no ‘qualifying purchases,’ and thus there is no obligation to provide any frequent flyer miles to them.” Concerning Count 3 (c. 93A), these defendants point to the Petersen Complaint’s lack of any allegation that a demand letter was sent, and add that the reversal of the plaintiffs’ purchases did not sink to the level of commercial depravity required for a Chapter 93A claim. These arguments (except regarding the demand letter, which the Jorgensen Complaint alleges was sent) are repeated in condensed form in their Jorgen-sen motion, with a cross reference to the motion papers in Petersen.
A. The Contract and the Parties
Whether an advertisement to the general public constitutes an offer that ripens into a contract upon a customer’s acceptance is a nuanced and fact-dependent question, see J. Perillo, 1 Corbin on Contracts §2.4 (Rev. Ed. 1993), but one without much to do with Complaints that allege (albeit more specifically in Jorgensen than in Petersen) that the customers placed their orders and made payments, and that the merchant(s) acknowledged the orders, opened customer accounts and began providing the service contracted for. The Complaints thus allege a series of contracts by which money was exchanged for storage space plus 4,757 or 7,269 dividend miles, depending on the airline. The contract terms—which the defendants (or some of them) established—did not need to be further described than this.
Somewhat murkier is the question of what role each of the defendants had in the contracts to award dividend miles. US Airways’ assertion that EasyCGI was “clearly” the party with whom the plaintiffs contracted has, with the exception of the term “clearly,” a plausible ring to it. It was, after all, EasyCGI that supplied the computer storage service being advertised on the site (Petersen Complaint at ¶36), and which in Jorgensen’s case (at least) provided a written confirmation of his purchases and activated a customer account in his name. (Jorgensen Amended Complaint, p. 2 paras, ninth and tenth.)
On the other hand, most of the purchases were made on a page of the US Airways website (whose use, it proclaimed, was governed by US Airways’ Terms of Service), in exchange for credit toward a US Airways ticket in addition to computer storage space. (Id. at p. 2, paras, first, second, third, sixth, and eleventh.) There is also the web page’s assertion that the “website is hosted and powered by FreeCause, Inc. on behalf of US Airways, Inc.” Finally, there is the Petersen plaintiffs’ assertion, made partly on information and belief but plausibly enough, that the mileage mall that FreeCause hosts for Hawaiian Airlines follows the same business model as the US Airways mall. (Petersen Complaint, ¶¶35, 49.)
The Complaints in these cases do not provide a clear or comprehensive account of the business structure, the various defendants’ roles in it, and in the contracts made within it. Perhaps a more complete and properly authenticated picture of the contract documents of which the plaintiffs had actual or constructive notice will shed further light on these issues. For now, however, the Complaints plead enough facts to implicate EasyCGI, FreeCause, and the airlines as contracting parties.
2. The “Reversals”
The EasyCGI-FreeCause-Hawaiian defendants, at least, assert that once the transactions were “reversed” (along, presumably, with all credit card charges and any dividend mile deposits), all obligations on their end ceased. This argument ignores “the black-letter law that one parly to a contract cannot alter or modify the rights or duties of a counteiparty by unilateral action.” Bright Horizons Children’s Centers, Inc. v. Sturtevant, Inc., 82 Mass.App.Ct. 482, 486 (2012). “An executory bilateral contract . . . may be rescinded or canceled by mutual consent of the parties,” Hanson & Parker v. Wittenberg, 205 Mass. 319, 326 (1910), but not otherwise, absent grounds (such as fraud, mutual mistake, etc.) not appearing on the face of either Complaint or elsewhere in the papers.
3. Causation and Damages
Assuming, as I must at the present stage of the proceedings, that each airline represented to consumers that FreeCause acted on the airlines’ behalf, and that each promised to award dividend miles to the plaintiffs in exchange for their “qualifying purchases,” it does not matter that it was EasyCGI and/or FreeC-ause that disavowed the transactions. The disclosed principal’s liability on the agent’s contract “is effectively consensual and based upon the ancient principle (albeit a fiction) of the law that ‘q ui Jacitper alium, Jacitper se,' i.e., the contractual act of the agent has the same legal effect as if done by the principal and makes the principal the actual party to and obligor of the undertaking.” Medeiros v. Middlesex Ins. Co., 48 Mass.App.Ct. 51, 57 (1999).
The defendants’ further arguments that the plaintiffs suffered no compensable damages from the disavowal of their purchases depend on matters outside the Complaints and the documents referenced or relied upon therein. US Airways points to a “Dividend Miles Membership Guide” which states, “Dividend miles have no cash value” (but then warns, incongru *669 ously, that ‘Tax consequences of Dividend Miles awards, if any, are the responsibility of the Dividend Miles member”). EasyCGI relies on a User Agreement which limits its “liability in connection with the services” to “the aggregate service fees paid by us to you during the 3-month period immediately preceding the event giving rise to such liability.”
Neither document is attached to, referenced in, or apparently relied upon in either Complaint; nor are they within bounds as matters of public record or the Court’s docket. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004); Schaerv. Brandéis University, 432 Mass. 474, 477 (2000); and Harhen v. Brown, 431 Mass. 838, 840 (2000). They therefore may not be considered on a Rule 12(b)(6) motion, and so it is unnecessary to consider what application, if any, they might have to the facts of these cases.[4]
4. Chapter 93A
On a firmer footing is the defendants’ argument that whatever the merits of the contract claims, Chapter 93A does not apply to these cases. “[T]he mere breach of a contract, without more, does not amount to a c. 93A violation.” Madan v. Royal Indemnity Co., 26 Mass.App.Ct. 756, 762 (1989). On the other hand, “conduct ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 454 (1991), quoting Wang Labs, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986).
This last formulation seems, at first blush, conducive to broad application; after all, what conduct in the usual commercial transaction—up to and including a breach of contract—is not motivated by economic self-interest? The cases in which it has been invoked successfully, however, have had
an additional factor. There is in those decisions a consistent pattern of the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness.
Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992); accord, Zabin v. Piciotto, 73 Mass.App.Ct. 141, 170 (2008) (withholding payment due under contract is a 93A violation if used “as a wedge against the other party to gain advantages”).[5]
No such facts are pleaded or suggested in the Complaints in these cases, which depict, as one of the plaintiffs aptly put it at oral argument, a straightforward case of “seller’s remorse.” Count 3 will therefore be dismissed as to all defendants.
ORDER
For the foregoing reasons, all defendants’ Motions to Dismiss are ALLOWED as to claims asserted under G.L.c. 93A, and are otherwise DENIED.

So called in the Petersen complaint. The defendants’ papers indicate that this is a d/b/a of Endurance International Group, Inc., as it is called in the Jorgensen complaint. I assume this to be so for present purposes, and will refer to this defendant, in respect to both cases, as EasyCGI.

Does 1-15 appear to be named as placeholders only.

The one Massachusetts resident among the plaintiffs, Jeff Filipov, did his shopping on the Hawaiian Airlines mileage mall.

The perils of reliance on matters “dehors the writ” are apparent from the copy of the User Agreement EasyCGI has submitted with its motion papers. This document, evidently printed from the internet on March 26, 2012, says at the end, ‘This file was last modified June 29, 2011.” This was, the plaintiffs pointedly observe, a few weeks q/terthey made their purchases.

As examples, the Zabin case cited Community Builders, Inc. v. Indian Motocyle Assocs., Inc., 44 Mass.App.Ct. 537, 558-59 (1998) (“failure to make payments was an unfair trade practice where breaching parties withheld payment to pressure the other party to compromise its claims for payment”); Pepsi-Coia Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985) (“failure to make payments was an unfair trade practice where breaching party withheld payment to enhance its bargaining power with the other party”); ArthurD. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55-56 (1st Cir. 1998) (“failure to make payments was an unfair trade practice where breaching party withheld payment to force the other party to accept discounted settlement of its claims for payment”). To these, one might add the cases of Anthony’s Pier Four (real estate seller’s pretextual exercise of discretionary approval power over buyer’s architectural designs in order to extort an increase in price); Wang Laboratories (early termination of contract in order “to obtain the benefits of [the] contract for [the terminating party] without cost and in disregard of known contractual arrangements”); Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 825 (1982) (submission of low bid with intent to demand higher price after award of contract); Tufankjian v. Rockland Triust Co., 57 Mass.App.Ct. 173, 178-79 (2003) (bank, having provided loan commitment, thereafter took actions and positions “designed to force financial concessions from” the borrower); Clamp-All Corp. v. Foresta, 53 Mass.App.Ct. 795, 812-13 (2002) (counterclaim defendant “terminated the marketing agreement to compel [counterclaim plaintiffl to accept lower commissions”); and Piccicuto v. Dwyer, 32 Mass.App.Ct. 137, 139 (1992) (commercial landlord’s agent withheld consent to transfer of lease by lessee to buyer of his business, demanding $50,000 of the sale price for himself).